## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **JENNIFER LOUISE IVEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:12CV131 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,[1]** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Jennifer Louise Ivey for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 15). Defendant filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On April 14, 2008, plaintiff filed an application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on October 31, 2007. (Tr. 172-74). This claim was denied initially and, following an administrative hearing, plaintiff's

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated November 22, 2010. (Tr. 64, 7-19). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 1, 2012. (Tr. 4, 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on October 4, 2010. (Tr. 31). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Diane Smith. (Id.).

Plaintiff's attorney stated that plaintiff has a combination of mental and physical difficulties. (Tr. 32). Plaintiff's attorney stated that plaintiff experiences panic attacks when she is in public, and does not typically have panic attacks at home unless she has company. (Tr. 32-33). He indicated that plaintiff also has crying spells, suffers from depression, and sleeps a lot. (Tr. 33). Plaintiff's attorney stated that plaintiff has migraine headaches, lower back pain that goes down into her right leg, mild scoliosis, peripheral vascular disease,[2] and asthma. (Id.). Plaintiff's attorney stated that plaintiff suffers from post-traumatic stress disorder ("PTSD")[3] as a result of

---

[2]Peripheral vascular disease refers to any disease or disorder of the circulatory system outside of the brain and heart. It is often used as a synonym for peripheral artery disease, which is caused by build-up of fatty material within the vessels of the arteries. See WebMD, http://www.webmd.com/heart-disease/peripheral-vascular-disease (last visited September 17, 2013).

[3]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed

being sexually abused by her biological father from the age of five to seven. (Tr. 33-34). He stated that plaintiff's sister's husband raped her and physically abused her. (Tr. 34). Plaintiff's attorney stated that plaintiff has flashbacks when she smells cologne. (Id.). Finally, plaintiff's attorney indicated that plaintiff has had drug issues in the past, but this has not been a problem for five years. (Id.).

The ALJ examined plaintiff, who testified that she was thirty years of age, and completed the ninth grade. (Tr. 34). Plaintiff stated that she is able to read and write. (Id.). Plaintiff testified that she had not had a driver's license for eleven years. (Tr. 35).

Plaintiff stated that she was five-feet, eight-inches tall, and weighed 232 pounds. (Id.). Plaintiff testified that she last worked in 2006, for Town and Country grocery store. (Id.). Plaintiff stated that she worked at this position for three months, and left due to lack of transportation. (Id.).

Plaintiff testified that she is unable to work because she has a hard time bending down and being around people. (Tr. 36). Plaintiff stated that her back was "kind of sore" while she was sitting during the hearing. (Id.).

Plaintiff testified that she experiences migraines about three times a month, which sometimes last for several hours. (Id.). Plaintiff stated that she is able to get up and move around after the migraine ends. (Id.).

Plaintiff testified that her medications help, and that they do not cause any noticeable side effects. (Tr. 37). Plaintiff stated that she does not use a cane, walker, or brace for ambulation.

---

responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's Medical Dictionary, 570 (28th Ed. 2006).

(Id.).

Plaintiff testified that she lives with her four-year-old daughter, her mother, her mother's boyfriend, her sister, her sister's boyfriend, and her sister's daughter. (Id.). Plaintiff stated that she takes care of her daughter, and helps with household chores and meals. (Tr. 38).

Plaintiff testified that, on a typical day, she eats breakfast with her daughter, watches television with her daughter, plays with her daughter, takes a nap with her daughter, eats dinner, and then goes to bed. (Id.). Plaintiff stated that she and her daughter visit friends who live thirty minutes away a couple times a month. (Tr. 39). Plaintiff testified that her mother and her mother's boyfriend do all of the grocery shopping. (Id.). Plaintiff stated that she cleans, does laundry, and washes dishes. (Tr. 40). Plaintiff testified that she does not like leaving the house or being around people. (Id.). Plaintiff stated that she enjoys playing with her daughter in the park. (Id.).

Plaintiff stated that it helps somewhat to change positions frequently from sitting down, lying down, and standing. (Id.).

Plaintiff's attorney examined plaintiff, who testified that she only experiences panic attacks at home if there are a lot of people around. (Tr. 41). Plaintiff stated that she had not had a panic attack during the hearing, although she was really nervous. (Id.). Plaintiff testified that she brought a friend with her to the hearing for support. (Id.).

Plaintiff stated that she does not like going out in public. (Id.). Plaintiff testified that her mother does all of the grocery shopping due to her fear of going out. (Tr. 42). Plaintiff stated that she last went grocery shopping about one month prior to the hearing, and that her hands began to sweat, her body was shaking, her chest hurt, and she had difficulty breathing. (Id.).

Plaintiff testified that she had these problems when she was working at Town and Country in 2006, and that her condition was about the same at the time of the hearing as it was in 2006. (Id.). Plaintiff stated that she tried to stay in the back and wash dishes when she worked at Town and Country so she could avoid being around people. (Tr. 42-43).

Plaintiff testified that she experiences pain in her lower back that goes down into her right leg. (Tr. 43). Plaintiff stated that she was scheduled to undergo an MRI the day after the hearing. (Id.). Plaintiff testified that Dr. Paul Rains ordered the MRI. (Id.).

Plaintiff stated that she has peripheral vascular disease, which causes her to experience a sensation "like somebody is putting pins in [her] legs." (Tr. 44). Plaintiff testified that she experiences pain when she tries to move her legs. (Id.). Plaintiff stated that she fell on one occasion. (Id.). Plaintiff testified that her peripheral vascular disease "mostly just makes it hard to sleep." (Id.).

Plaintiff stated that she is able to work around her house for thirty to forty minutes before she has to take a twenty-to-thirty-minute-long break. (Id.).

Plaintiff testified that one of her biggest problems is her PTSD. (Tr. 45). Plaintiff stated that the sexual abuse she experienced causes her to not trust people, not want to be around people, and have nightmares and flashbacks. (Id.). Plaintiff testified that seeing pictures of her abusers and smelling cologne that reminds her of them causes her to have flashbacks of the abuse. (Id.).

Plaintiff stated that she does not have much of a work history because she was involved with drugs at a young age. (Tr. 46). Plaintiff testified that she participated in a residential rehab program that was effective. (Id.).

Plaintiff stated that her friend picks her up when they visit.  (Id.).

The ALJ examined the vocational expert, Diane Smith, who testified that plaintiff's past work is classified as follows: cashier (semi-skilled, light); deli worker (unskilled, light); meat clerk (unskilled, medium); home care attendant (semi-skilled, medium to heavy); and security guard (semi-skilled, light).  (Tr. 48-49).

The ALJ asked Ms. Smith to assume a hypothetical claimant with plaintiff's background and the following limitations: capable of performing sedentary work; occasional kneeling; no climbing ladders, ropes, or scaffolds; no exposure to hazardous waste; occasional postural functions; and work where interpersonal contact with a worker is incidental only to the work performed.  (Tr. 49).  Ms. Smith testified that the individual would be unable to perform plaintiff's past work but could perform other unskilled, sedentary jobs, such as: order clerks (360,000 positions nationally, 18,000 regionally); compact assembler (220,000 nationally, 8,000 regionally); and press operator (150,000 positions nationally, 5,000 regionally).  (Tr. 50).

Ms. Smith testified that a limitation of no contact with co-workers or the public whatsoever would preclude competitive work.  (Id.).

Ms. Smith testified that an individual who would miss more than three days of work a month would be precluded from all competitive employment.  (Tr. 51).

The ALJ indicated that he would leave the record open for fourteen days to allow plaintiff to submit the results of her MRI.  (Id.).

**B.    Relevant Medical Records**

Plaintiff underwent x-rays of the lumbar spine due to complaints of low back pain on

February 19, 2008, which revealed early degenerative arthritis, and mild scoliosis.[4] (Tr. 255).

Plaintiff presented to Patrick LeCorps, M.D. on May 28, 2008, with complaints of low back pain. (Tr. 263). Dr. LeCorps indicated that plaintiff had been seeing Dr. Samuel for treatment of her back pain for five months, without any improvement. (Id.). Plaintiff described the pain as constant, with radiation to the lower limbs. (Id.). Upon examination, plaintiff was able to bend and touch her toes with some pain in the lumbar area; hypertension of the lumbosacral spine was normal; lateral flexion was painful but feasible; straight leg raising was about seventy degrees bilaterally; deep tendon reflexes of the knees were decreased; and plaintiff had pain in the lumbar region and perilumbar muscles on palpation. (Id.). Dr. LeCorps stated that plaintiff may have an L5 radiculopathy[5] due to a herniated disc, and she may have SI joint arthropathy[6] or a locked facet. (Id.). Dr. LeCorps indicated that plaintiff would be treated conservatively for the next six weeks with ultrasound, massage, heat, muscle relaxers, and pain medication. (Id.). If plaintiff did not improve, an MRI would be ordered. (Id.).

Plaintiff presented to Paul Rains, D.O., on June 2, 2008, with complaints of lumbar back pain. (Tr. 272). Upon examination, plaintiff had good range of motion of all four extremities, peripheral pulses to all extremities were +2/5, no abnormal reflexes were noted, and tenderness was noted across the lumbar back. (Tr. 271). Dr. Rains diagnosed plaintiff with acute and chronic lumber back pain. (Tr. 270). Dr. Rains administered trigger point injections and

---

[4]Abnormal lateral and rotational curvature of the vertebral column. Stedman's at 1734.

[5]Disorder of the spinal nerve roots. Stedman's at 1622.

[6]Any disease affecting a joint. Stedman's at 161.

prescribed Lorcet.[7]  (Id.).

State agency psychologist Marsha Toll, Psy.D., completed a Psychiatric Review

Technique on June 27, 2008, in which she expressed the opinion that plaintiff's mental

impairments were not severe and resulted in a mild limitation in plaintiff's ability to maintain social

functioning.  (Tr. 286-96).

On July 2, 2008, plaintiff complained of thoracic and lumbar back pain.  (Tr. 299).  Upon

examination, plaintiff had good range of motion of all four extremities, and tenderness to

palpation was noted across the thoracic and lumbar back.  (Id.).  Dr. Rains diagnosed plaintiff

with acute and chronic thoracic and lumbar back pain.  (Id.).  Dr. Rains administered trigger point

injections, and refilled plaintiff's Cymbalta[8] and Naprosyn.[9]  (Id.).  On August 19, 2008, plaintiff

complained of cervical, thoracic, and lumbar back pain.  (Tr. 309).  Tenderness was noted to the

cervical, thoracic, and lumbar back on examination.  (Id.).  Dr. Rains diagnosed plaintiff with

acute and chronic cervical, thoracic, and lumbar back pain.  (Id.).  He administered trigger point

injections, refilled plaintiff's Cymbalta and Lorcet, and prescribed Flexeril.[10]  (Id.).  On August 29,

2008, plaintiff complained of lumbar back pain.  (Tr. 312).  Dr. Rains noted tenderness to the

---

[7]Lorcet contains Hydrocodone, which is an opioid analgesic indicated for the relief of
moderate to moderately severe pain.  See Physician's Desk Reference (PDR), 527 (59th Ed.
2005).

[8]Cymbalta is indicated for the treatment of major depressive disorder and generalized
anxiety disorder.  See PDR at 1801.

[9]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of
osteoarthritis.  See PDR at 2874-75.

[10]Flexeril is indicated for the treatment of muscle spasms.  See WebMD,
http://www.webmd.com/drugs (last visited September 17, 2013).

lumbar and thoracic back.  (Id.).  Dr. Rains diagnosed plaintiff with acute thoracic and lumbar

back pain and muscle spasms.  (Id.).  Dr. Rains administered trigger point injections and ordered

x-rays.  (Id.).  Plaintiff continued to see Dr. Rains approximately monthly through July 2010, for

treatment of her back pain with trigger point injections and pain medication.  (Tr. 322-449).  On

September 26, 2008, Dr. Rains diagnosed plaintiff with chronic anxiety in addition to her back

pain and spasms.  (Tr. 317).  On November 4, 2008, plaintiff reported that she cries for no reason

about once a week, although she does not feel depressed, and the Cymbalta helped.  (Tr. 387).

Dr. Rains diagnosed plaintiff with chronic anxiety and chronic depression.  (Id.).   On February

12, 2010, plaintiff reported that her severe lumbar back pain was not improving.  (Tr. 436).

Plaintiff also complained of a great deal of anxiety and depression.  (Tr. 436).  On May 7, 2010,

plaintiff reported a great deal of anxiety and indicated that the Cymbalta was not helping with her

depression.  (Tr. 424).  Dr. Rains discontinued the Cymbalta and replaced it with Celexa.[11]  (Id.).

On July 2, 2010, plaintiff complained of back pain, pain to the chest bilaterally, and anxiety.  (Tr.

400).  Dr. Rains administered trigger point injections, and prescribed Ultracet[12] and Vistaril.[13]

(Id.).  On July 9, 2010, plaintiff complained of anxiety, depression, back pain, and pain to the

buttocks.  (Tr. 394).  Dr. Rains prescribed Lorcet and Ambien.[14]  (Id.).  On July 26, 2010,

---

[11]Celexa is an antidepressant drug indicated for the treatment of depression.  See PDR at 1161.

[12]Ultracet is indicated for the treatment of moderate to moderately severe pain.  See WebMD, http://www.webmd.com/drugs (last visited September 17, 2013).

[13]Vistaril is indicated to relieve itching caused by allergies and to control nausea and vomiting.  It is also used to treat anxiety.  See WebMD, http://www.webmd.com/drugs (last visited September 17, 2013).

[14]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2692.

plaintiff requested a change of her "nerve medication." (Tr. 391). Dr. Rains prescribed Triavil.[15] (Id.).

Plaintiff underwent a segmental blood pressure study of both lower extremities on January 19, 2009, which revealed peripheral vascular disease involving both lower extremities, most significant in the right lower extremity. (Tr. 457).

Plaintiff underwent x-rays of the lumbar spine on January 30, 2010, which revealed no acute fracture or subluxation; and moderate scoliosis at L3-L4. (Tr. 453). On May 14, 2010, lumbar spine x-rays revealed mild to moderate scoliosis, but no significant degenerative changes. (Tr. 450). X-rays of the thoracic spine revealed early degenerative arthritis; and mild scoliosis. (Tr. 451). X-rays of the cervical spine were unremarkable. (Tr. 452).

Plaintiff underwent an MRI of the lumbar spine on October 5, 2010, which revealed minimal annular bulging at L4-5; and no evidence of disc herniation or canal stenosis.[16] (Tr. 473).


**The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since April 14, 2008, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, arthritis, scoliosis, and mood disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404,

---

[15]Triavil is an antidepressant drug indicated for the treatment of depression and anxiety. See WebMD, http://www.webmd.com/drugs (last visited September 17, 2013).

[16]Narrowing of the spinal canal. See Stedman's at 1832.

Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant requires work that would not involve climbing ladders, ropes, scaffolds, or exposure to hazards and work that involves no more than occasional kneeling and performance of all remaining postural functions.  Further, the claimant requires work where interpersonal contact to the claimant would be incidental to the work performed.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on December 14, 1979 and was 28 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills  (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 14, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-18).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on April 14, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 18).

- 11 -

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598,

- 12 -

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.  Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to consider listings 1.02 and 1.04. Plaintiff next argues that the ALJ erred in determining plaintiff's RFC.  Plaintiff finally argues that the ALJ failed to properly consider plaintiff's chronic pain in determining plaintiff's RFC.  The undersigned will discuss plaintiff's claims in turn.

**1.  Listings**

Plaintiff contends that the ALJ erred in failing to consider listing 1.02 (major dysfunction of a joint) and listing 1.04 (disorders of the spine).  The claimant bears the burden of proving his impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing requirement, an impairment must meet all of the listing's specified criteria.  Id. An impairment that only meets some criteria does not qualify, no matter how severe the impairment.  Id.

In this case, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment.  (Tr. 12).  The ALJ specifically indicated that he had considered listings 1.02 and 1.04.

The undersigned finds that plaintiff has failed to demonstrate that her impairments meet the requirements of listing 1.02 or 1.04.

Listing 1.02 states, in relevant part,

1.02    *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A.      Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or

B.      Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, App. 1, § 1.02.

The "inability to ambulate effectively" means an extreme limitation in the ability to walk, which generally requires the use of an assistive device.  20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(B)(2)(b).  The "inability to perform fine and gross movements" means an extreme loss of function of both upper extremities.  20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(B)(2)(c).

In this case, there is no indication in the medical record that plaintiff had any difficulty walking on her own, or that plaintiff had extreme loss of function in her upper extremities.  Thus, the ALJ properly found that plaintiff's condition did not meet or equal listing 1.02.

To meet listing 1.04, "disorders of the spine," a claimant not only must have a disorder resulting in the compromise of a nerve root or the spinal cord, but also must meet the specific symptoms and documentation requirements under 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 1.04(A), (B), or (C).  Here, there is no evidence that plaintiff's spinal impairment resulted in the compromise of a nerve root or the spinal cord.  Plaintiff has failed to point to any evidence in support of her claim that she satisfied the requirements of listing 1.04.

Accordingly, the ALJ's finding that plaintiff did not have an impairment that meets or

equals a listed impairment is supported by substantial evidence.

## 2.    Residual Functional Capacity

Plaintiff next argues that the ALJ erred in formulating plaintiff's RFC.  Plaintiff contends that the ALJ failed to consider all of plaintiff's exertional and nonexertional impairments, and failed to adequately develop the record.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant requires work that would not involve climbing ladders, ropes, scaffolds, or exposure to hazards and work that involves no more than occasional kneeling and performance of all remaining postural functions.  Further, the claimant requires work where interpersonal contact to the claimant would be incidental to the work performed.

(Tr. 13).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (abrogated on other grounds), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700,

704 (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in

<u>Lauer</u>, 245 F.3d at 704, that "'[s]ome medical evidence,' <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th

Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ

should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,'

<u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at

least some supporting evidence from a professional." <u>Id.</u> <u>See</u> <u>also</u> <u>Vossen v. Astrue</u>, 612 F.3d

1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a

claimant's RFC and because RFC is a medical question, some medical evidence must support the

determination of the claimant's RFC."); <u>Eichelberger</u>, 390 F.3d at 591.

With regard to the opinion evidence, the ALJ stated that "DDS medical consultant

Deborah McWilliams" expressed the opinion that plaintiff was limited to sedentary work activity.

(Tr. 17). The ALJ indicated that he was assigning "significant weight" to the opinion of Ms.

McWilliams. (<u>Id.</u>).

Ms. McWilliams, a single decision-maker, completed a Physical Residual Functional

Capacity Assessment ("PRFCA") on June 21, 2008, in which she expressed the opinion that

plaintiff was capable of performing sedentary work. (Tr. 280-85).

Under a test of modifications to the disability determination procedures, a single

decision-maker "will make the disability determination after any appropriate consultation with a

medical or psychological consultant." 20 C.F.R. §§ 404.906, 416.1406 (defining role of single

decision-maker under proposed modifications to disability determination procedures). <u>See</u> <u>also</u>

<u>Shackleford v. Astrue</u>, 2012 WL 918864, *3 n. 5 (E.D. Mo. Mar. 19, 2012) ("Single decision-

makers are disability examiners authorized to adjudicate cases without mandatory concurrence by

a physician.") (citation omitted). A single decision-maker is not considered a medical source. See Gaston v. Astrue, 2012 WL 3045685, *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decisionmaker" as "single decisionmaker" was a disability counselor and not an acceptable medical source as defined by the regulations). Indeed, it is error for an ALJ to consider a PRFCA by a single decision-maker. See Andreatta v. Astrue, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by single decision-maker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decision-makers). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ evaluated the opinion of a lay person as a medical expert).

In this case, the ALJ referred to Ms. McWilliams, a lay person, as a "medical consultant," and accorded "significant weight" to this opinion. (Tr. 17). The ALJ erred in relying on the opinion of the single decision-maker. See Andreatta, 2012 WL 1854749 * 10 (holding remand required when ALJ relied on the opinion of a single decision-maker, even if the RFC would be permissible absent consideration of single decision-maker's report).

Further, there is no opinion in the record from any physician regarding plaintiff's work-related limitations. Plaintiff did not undergo a consultative physical examination. Plaintiff's back impairment has been treated regularly with pain medication and trigger point injections. Plaintiff's treating physician has consistently noted tenderness and spasm on examination. There is no opinion from any physician, however, regarding how plaintiff's impairments affect plaintiff's ability to work. Thus, the ALJ's physical RFC determination is not supported by substantial

evidence.

Similarly, there is no medical opinion in the record from an examining source regarding plaintiff's mental limitations. Dr. Rains diagnosed plaintiff with chronic anxiety and depression in November 2008, and prescribed psychotropic medications. (Tr. 387). Plaintiff continued to complain of symptoms of depression and anxiety to Dr. Rains through July 2010. (Tr. 234-55). Plaintiff complained of increased anxiety and depression beginning in February 2010. (Tr. 436). Dr. Rains continued to adjust plaintiff's psychiatric medications, but has provided no indication as to how plaintiff's mental impairments affect her ability to work.

State agency psychologist Marsha Toll completed a Psychiatric Review Technique on June 27, 2008, in which she expressed the opinion that plaintiff's mental impairments were not severe. (Tr. 286-96). The ALJ indicated that he was assigning "less weight" to the opinion of Dr. Toll. (Tr. 17). The ALJ, however, failed to point to any evidence in support of his mental RFC.

The ALJ has the duty to develop the record, which includes developing the record as to the medical opinion of the claimant's treating physician. Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987). The ALJ is required to re-contact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).

Here, the medical record reveals that plaintiff has received regular treatment for depression and anxiety. Plaintiff testified that she does not like being around people, experiences panic attacks, and experiences symptoms of PTSD due to a history of sexual abuse. (Tr. 40, 41, 45). Plaintiff has been prescribed multiple psychotropic medications. Thus, the ALJ should have further developed the record by either contacting plaintiff's treating physician or ordering a consultative mental examination addressing plaintiff's ability to function in the workplace. In addition, the ALJ should have further developed the record regarding plaintiff's physical impairments.

## Conclusion

In sum, the residual functional capacity determined by the ALJ is not supported by substantial evidence. The ALJ relied on the opinion of a non-medical single decision-maker. No examining physician expressed an opinion regarding plaintiff's physical or mental ability to function in the workplace. For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to obtain medical evidence addressing plaintiff's ability to function in the workplace; reassess plaintiff's residual functional capacity; and then continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  17th   day of September, 2013.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE